(November 26, 1901.)

## BARTON v. DUNLAP.

[66 Pac. 832.]

ORAL AGREEMENT FOR SALE OF REAL ESTATE.—An oral agreement, where there is part performance for the sale of real estate, may be enforced under section 6008 of the Revised Statutes of this state.

WHEN MAY BE ENFORCED.—Valuable improvements placed upon real estate under oral agreement to purchase removes the bar, statutes of frauds, and the purchaser may enforce his contract in a court of equity.

(Syllabus by the court.)

APPEAL from District Court, Latah County.

Orland & Smith, for Appellant.

The statutes of Idaho provide that no estate or interest in real estate except for leases for one year or less can be created, granted, assigned, surrendered or declared, except by an instrument in writing. (Idaho Stats., sec. 6007.) In this state by statute the equity rule prevails that part performance of an oral contract, for the sale of real estate, removes the bar. (Rev. Stats., sec. 6008.) It is universally held both in this country and in England, that part payment of the purchase price, entry under the contract, and retention of possession is sufficient part performance, and that under these conditions the contract will be enforced; and if improvements have been made by the purchaser, there is much more reason for the enforcement of the contract. (3 Pomeroy's Equity Jurisprudence, 8th ed., sec. 1409; *Day v. Cohn,* 65 Cal. 508, 4 Pac. 511; *Love v. Watkins,* 40 Cal. 548, 6 Am. Rep. 624; *Murray v. Jayne,* 8 Barb. 613; *Calanchina v. Branstetter,* 84 Cal. 249, 24 Pac. 149.) The appellant on the fifth day of June, 1897; and for a long time prior thereto, was in the absolute, notorious and exclusive possession of the lot, and the respondent had actual notice of such possession, and of appellant's rights and claim, and if the respondent was a purchaser at all, which we deny, he was so in his own wrong, and is not entitled to relief, and

should be decreed to convey. (*Starkey v. Starkey,* 136 Ind. 349, 36 N. E. 287; *Robinson v. Thrailkill,* 110 Ind. 117, 10 N. E. 647; Rev. Stats., secs. 3015, 3016.) The appellant being in possession of the lot at the time of the transfer, and having an equity therein, the respondent was bound to take notice of that right, even though he had not had notice. (*Bird v. Dennison,* 7 Cal. 304; *Bryan v. Ramirez,* 8 Cal. 462; 68 Am. Dec. 340; *Morrison v. Wilson,* 13 Cal. 500, 73 Am. Dec. 593; *Hunter v. Watson,* 12 Cal. 375, 73 Am. Dec. 543.) The respondent taking the legal title to the property with notice of the equity and claim of appellant, he being in possession and having erected substantial improvements, took the same subject to the rights of appellant, and a resulting or constructive trust arose, and will be enforced against him. (1 Pomeroy's Equity Jurisprudence, 8th ed., secs. 729, 730; *Jones v. Van Doren,* 130 U. S. 684, 9 Sup. Ct. Rep. 685; *Harris v. McIntyre,* 118 Ill. 275, 8 N. E. 182; *Murphy v. Whitney,* 140 N. Y. 541, 35 N. E. 930.) The statute of frauds has no application to resulting or constructive trusts arising by operation of law. (*Peabody v. Tarbell,* 2 Cush. (Mass.), 227; 22 Am. & Eng. Ency. of Law, 1st ed., 46-50.) The statute of frauds will never be allowed to support a fraud, or permit one to be perpetrated. (*Robbins v. Robbins,* 89 N. Y. 252; *Moore v. Crawford,* 130 U. S. 122, 9 Sup. Ct. Rep. 447.)

Forney & Moore, for Respondents.

The alleged contract between Hallett and defendant is not binding on the townsite company. (*Duffy v. Hobson,* 40 Cal. 240, 6 Am. Rep. 617; *Armstrong v. Lowe,* 76 Cal. 616, 18 Pac. 758; *Grant v. Ede,* 85 Cal. 418, 20 Am. St. Rep. 237, 24 Pac. 890; *Kleinhaus v. Jones,* 68 Fed. 742; and cases cited.) The equitable relief of specific performance of contract is not a matter of right, strictly speaking, but rests in the sound discretion of the court, upon an impartial view of all the circumstances surrounding the matters in controversy. (*Vincent v. Larson,* 1 Idaho, 241; *Cooper v. Pena,* 21 Cal. 404; *Bruck v. Tucker,* 42 Cal. 346, 353; *Semour v. De Lancy,* 6

Johns. Ch. 222, 2 N. Y. Ch. Rep., L. ed., 106; *Hennessey v. Woolworth,* 128 U. S. 538, 9 Sup. Ct. Rep. 109, 32 L. ed. 500.)

STOCKSLAGER, J.—This case is here on appeal from the district court of Latah county. The appeal is based upon an order overruling a motion for a new trial, and also from the judgment. The complaint alleges that since the fifth day of June, 1897, plaintiff has been and now is the owner in fee and entitled to the possession of lot numbered 17, block 5, of the town of Juliaetta, said county and state, together with hereditaments, etc., thereunto belonging; that defendant now is, and for a long time has been, asserting and claiming an estate or interest in said premises adverse to the plaintiff, the exact nature of which claim of the defendant is unknown to plaintiff; that said claim is without right either in law or equity; that the defendant has no right or title to, or interest in said property, or any part or portion thereof; that on the 7th day of June, 1898, plaintiff demanded of defendant possession of said premises; that said defendant refused to deliver possession, and still refuses to so deliver the possession thereof, and has used and occupied the same without consent of plaintiff, and against his will; that the reasonable value of the use of said premises is reasonably worth twenty-five dollars per month, no part of which has been paid, etc. Then prays that the defendant be required to set forth the nature of his claim; that plaintiff be deemed to be the owner, in fee simple, of said premises, and that his title thereto be quieted as against any and all claims of the defendant, etc.; *that the defendant be ordered to deliver* possession of said premises to the plaintiff, and be forever enjoined and debarred from asserting any claim to said lands or premises; that plaintiff have judgment for the sum of $400 rental for said premises from July 7, 1898, to time of commencement of this suit, for costs of suit, etc. Defendant answered, admitting that he is in the possession of the property in controversy, and has been since the year 1895; admits the demand and refusal to surrender possession to plaintiff. The other allegations of the complaint are denied. By his cross-complaint he avers that he is entitled to a deed from plaintiff

to the lot in dispute, by reason of a purchase from the Juliaetta Townsite Company and payment in full therefor; and a prayer for equitable relief. All averments of the cross-complaint, by a stipulation made in open court, are to be treated as denied. By the record it is shown that a jury was waived and trial had. Plaintiff introduced deed from Rupert Schupfer and wife, to E. T. Barton, dated June 5, 1899, which included the lot in controversy. E. T. Barton testified he was acquainted with the property and the rental value; it was worth twenty-five dollars per month. On cross-examination said he was the owner of the property in controversy, was not acquainted with the rental value of property in Juliaetta to any great extent. "I don't know what store buildings rent for. I don't know what the rental value of buildings or property in Juliaetta is. I have talked with a number there who told me what they were paying. This property is used as a livery-stable. There is a building upon it. Do not know the size of the building." Plaintiff then rested. Being called by defendant, the same witness testified: "Q. Mr. Barton, who was in possession of that lot at the time that this deed from Mr. Schupfer to you was made? A. I think Mr. Dunlap was. The Court. The defendant? A. The defendant. Did not know who erected the livery barn on the lot; believe that Mr. Dunlap (defendant) did—had been told so. Have talked with Dunlap with reference to it since getting the deed. I knew when I got the deed that Dunlap was in possession and running the livery barn. Mr. Schupfer told me so. Mr. Schupfer was the party from whom I got the lots. Quite a large number deeded to me at the same time. Don't know how many. Mr. Schupfer did not tell me at the time he deeded it to me that Dunlap owned the lot. He told me that Mr. Dunlap had a barn on the property, but that he (Schupfer) had never received any money under the contract that the property was to be sold under, and he didn't hesitate to give me a warranty deed for the property. He did not tell me that Dunlap paid for the lot. At the time these lots were deeded to me, on the 5th of June, I did not become the owner under this deed of all the property mentioned in it. There was an understanding that I was to deed certain parts of it to other

parties. The names of the parties are George Langdon, I. C. Hattabaugh, George Webber, Charles Snyder, Frank White, Spottswood & Veatch. I do not think of any more besides myself. Potter was not one. I think the consideration paid was $150 at time deed was delivered. The way these lots came to be deeded to me was that it was adjusted by those that had interests in it it would be deeded to me and afterward we would divide up among ourselves the best way we could. Mr. Schupfer claimed these lots prior to this time." In answer to question as to whether anyone else claimed an interest in these lots and attention being directed to whether Webber et al., said he did not know, but believed they had through the Juliaetta Townsite Company. He was not a member of that company. At the time the deed was given does not think there was a bond or contract between Schupfer and the townsite company. Had been a bond, but thinks it was forfeited. Rupert Schupfer testified property in controversy is part of his homestead. "In 1891 I contracted with I. C. Hattabaugh for the Juliaetta townsite. It included this lot 17. It was in writing. I looked for the contract last night but couldn't find it. The bond was surrendered up to me when I gave that deed there. The consideration for the deed was, I turned over those lots there that were not deeded, and received $150 in cash, and kept the property which was not deeded over, which was included in the bond to the value of $150 and got back the bond with the money. There was a certain amount due me on the property that of course there was not property enough to pay me for, and there was no real sale for property, and we came to an agreement that I would take that and make a deed to the property, which I did. It settled up the transaction. Had a conversation with Mr. Barton with reference to this property at or about the time of making this deed with reference to this lot in controversy. We talked it over about Dunlap claiming he bought the lot from Fred Hallett and claimed that he had paid for it, and of course he knew Dunlap had a barn on it. I told Barton that Dunlap claimed—of course I didn't see Dunlap pay the money. I believe he has paid it. The Court. Did you tell Barton you believed he had paid it, or just

your belief? Just tell what you told Barton. A. I don't know for certain. I thought it was understood. The conversation I had with Barton was before I delivered the deed. Don't know the exact date that Dunlap bought the lot. Fred Hallett was a member of the townsite company. He transacted the business of this syndicate or association in Juliaetta. George Bratton used to sell lots for the townsite company before Hallett came down there. There is a livery-stable on this lot. I know the value of the improvements placed upon the lot. I should judge in the neighborhood of $600 improvements placed there by defendant, Dunlap, about four or five years ago. No improvements on the lot excepting those placed there by Dunlap; I know Dunlap claimed to have bought the lot in about 1895. In selling lots Mr. Hallett generally presented me with a bond for a deed to acknowledge and turn over to him. What the lot was paid for I would make out deed. I think Mr. Berryman was the first one to tell me of the sale of this lot to Dunlap. He was selling lots on commission for the townsite company. Mr. Dunlap has demanded a deed from me I think three or four years ago." On cross-examination testified: "He knew George Langdon. Had conversation with him just before making deed to Barton. Langdon said the townsite company was trying to straighten the matter out; that the company had gone under. There was $1,500 due me at that time. Did not ask me if I would make an arrangement with him so he could form a pool, or get some parties to take the balance. Barton and I had the bond when we checked up the description in this deed before it was signed. The bond was not turned over to me then. I got the bond when I received the money from Mr. Langdon, when I gave the deed. Barton had the bond when we were checking up. When I received the bond it was assigned by Hattabaugh as trustee to Ed Barton. I did not tell Barton that Mr. Dunlap had never paid me for the lot, and that I felt at perfect liberty to give a warranty deed. I told him Dunlap claimed he paid Hallett in lumber and livery hire. Under the arrangement I had with Hallett or this townsite company, I think Hallett did have authority to take lumber or livery hire for the lots. It was

not mentioned in the bond that I could give bonds when sales were made on time to the purchasers from the townsite company. I should deed the property as I received the money. I believe they called Mr. Hallett the secretary of the townsite company. The reason I had not given Mr. Dunlap a deed was' that the money had been turned over to me." S. T. Dunlap (defendant) testified: "In spring of 1895 bought lot from Mr. Hallett or townsite company. He was the agent. Was to pay $100 in lumber inside of a year; paid thirty-seven dollars and fifty cents in lumber when it was demanded; paid the rest in livery hire, as they asked me. A month before the time expired I informed them that the lumber was ready and I wanted the deed. They said they did not want the lumber at the present time, they would take livery hire for balance. (Paper identified as receipt, to wit: Lewiston, Idaho, June 28, 1897. Received of S. T. Dunlap one hundred and 00/100 dollars in lumber for lot on Main street for livery barn. No. ——, Juliaetta Townsite Co., by Fred W. Hallett.) Receipt was not given at time of payment, given after I was notified that I didn't own the lot. Took possession May 1895. When I went to Juliaetta to look for a location Mr. Berryman and Mr. Schupfer were with me. Schupfer told me if I would take lot 17 he would give a clear title. I took the lot for $100. Berryman told me that when I paid for the lot I would get deed from Schupfer. When I was ready I went to Hallett and asked for a deed, and he said he would get it for me. The improvements I put upon this lot cost $750. I had no written contract with Hallett or Berryman. I know that Hallett was agent when I bought the lot. Hallett was representing the townsite company. Don't know that it was in any other capacity than agent. Have had conversations with members of the townsite company with reference to this lot—with Webber, Hattabaugh, Langdon, Mr. White; that is all I remember. I talked with them several times about it. Have paid the taxes on the property since 1895." On cross-examination said: "I gave the property in for assessment in 1896 and every year since." Godfret Webber testified: "Was acquainted with all the parties. Mr. Hallett was a member of the Juliaetta Town-

site Company. Don't know whether it was Fred Hallett or Hallett & Sons. Fred Hallett was a son of J. M. Hallett. Always considered a member of Hallett & Sons. He was a member of the firm. I heard a number of times that Dunlap had bought the lot some time after the company had been organized, but I couldn't say how much he had paid for it. From 1892 to 1896 Hallett was secretary, and for a time the agent, of the townsite company at Juliaetta. He had all charge of sales. The deed was made to Barton in trust. (This answer was stricken out by the court, on motion of counsel for plaintiff.) (Page 4 of the minutes of the meetings of the Juliaetta Townsite Company were read as follows: May 25, 1892. Special meeting of the Juliaetta Townsite Company held in the office of J. N. Hallett & Sons. Present: P. Tillinghast, J. L. Hallett & Sons, Spottswood & Veatch, I. C. Hattabaugh, M. J. Shields, G. Webber, Geo. Langdon, J. L. Hallett elected chairman. Minutes of previous meeting read and approved. In regard to a local agent for the townsite company at Juliaetta it was moved and seconded that Fred N. Hallett be elected to transact business for the company at that place. Carried. Fred Hallett, secretary.) I have always considered Barton a member of this company." On cross-examination said: "I have never talked with Fred Hallett about this. Have never been able to see him. In the drawing I drew for Snyder, and drew the lot for him." Schupfer, recalled, testified: "In conversation with Barton he said that the company was simply taking the property over from me. The way I had it. Just acting in my place, and he would, of course, see how they would settle it up. Make Fred Hallett pay fer the lot if they could make him to." Frank L. White testified: "Was a member of the townsite company. Said at a meeting of the townsite company prior to the settling with Mr. Schupfer some one spoke of Dunlap's having paid Hallett. The understanding was, as I understood it, that Dunlap should have his title to the lot. That was my remembrance of it. Can't state exact words."

Upon these pleadings and evidence, the court rendered a judgment in favor of the plaintiff, quieting his title in and to

the said premises against all claims and demands of the defendant, and further decreeing that the expenditures and improvements made and erected upon said premises by the defendant, in the sum of $600, be offset by the value of the use and occupation of said premises by the defendant, the claim of the plaintiff therefor being of the value of $400; also decreeing costs to respondent. To this judgment and decree the appellant excepted, and assigns a number of errors, and brings the case here on a bill of exceptions settled and allowed on the first day of September, 1900, and also on appeal from the judgment. The facts are disclosed by the record, briefly stated, are: That Schupfer homesteaded a tract of land in Latah county. A company, consisting of a number of men, organized themselves into a company known as "the Juliaetta Townsite Company," and contracted to buy the land from Schupfer, agreeing to pay therefor $8,000. The townsite was platted, and the defendant, Dunlap, contracted to purchase lot 17, block 5. This was in the year 1895. He soon began the construction of a livery barn upon said lot which, when completed, was estimated to be of the value of from $600 to $750, and by the learned judge who tried the case below of the value of $600. A large number of lots were sold, but not sufficient to pay Schupfer the amount of his bond. When sales were made the money was to be paid to Schupfer, who was to execute and deliver the deeds and retain eighty-five cents out of each dollar he received to apply to the debt due him from the townsite company. One Fred Hallett was the secretary and agent of the townsite company. Defendant bought his lot from Berryman, whom he says was subagent for Mr. Hallett, and agreed to pay $100 for the lot within one year from the date of purchase. He paid thirty-seven dollars and fifty cents in lumber, and the balance in livery hire, and demanded his deed within the life of his contract. The property was assessed to defendant from 1895, and he paid all taxes assessed thereon up to the time of the trial. The payment of the consideration to Hallett for this lot was shown to have been in lumber and livery hire, and evidenced by a receipt within a short time after the lots were placed upon the market. A majority that were ever sold were disposed of. A

settlement for the $1,500 due Schupfer was effected by some of the members of the townsite company, they to pay him $150, and he take certain lots remaining unsold. The money was paid to Schupfer, and he executed his warranty deed to plaintiff for all lots not deeded or taken by him, including the lot in controversy. A drawing was had to divide the lots between the members of the townsite company, and the lot in dispute fell to one Snyder, but by a trade, without the knowledge of said Snyder, who was represented at said drawing by G. Webber, plaintiff became the owner of the lot. Plaintiff knew that defendant occupied the lot with a livery-stable and was claiming and demanding title to it, and was so informed when he took the deed from Schupfer. When Schupfer objected to making a warranty deed to the lot on account of the claim of defendant, he was informed by plaintiff it was all right—that they only desired to make Hallett pay the company for the lot.

Now, with this record before us, does the plaintiff come into a court of equity with clean hands? And can the judgment of the lower court be upheld? If so, we must say to the defendant: It is true you have paid the $100 you contracted to pay as the purchase price of the lot to the agent of the townsite company; it is true you have paid all taxes assessed against said property; it is true you have erected a livery barn on the lot costing you from $600 to $750, but you did not pay in money and get your deed from Schupfer, and the property has now passed into the hands of a party who knew of your claim and improvements you had made upon the lot. It is true you have been in the open, notorious, and undisputed possession of the property from May, 1895, until this action was commenced, in 1898, with promises from the representatives of the townsite company that you should have your deed, but notwithstanding all this you shall not have your deed. If we apply the old rule of equity to the plaintiff in this case, "He who seeks equity must do equity," in what position do we find him? When he gets his deed from Schupfer, either for himself or as the representative of the townsite company, and it matters not which, he is informed by Schupfer of the claim of defendant to this lot; finds him in possession of the lot with valuable improvements thereon,

and claiming the right of title thereto. In the drawing resorted
to this lot falls to another member of the townsite company,.
represented by Webber. Plaintiff exchanges the lots drawn by
himself with Webber without the knowledge or consent of Sny-
der, and then asks the court to eject the defendant, give him
the improvements placed upon the lot by the defendant at a cost
of $600 to $750, in good faith, believing that he had fulfilled his.
contract and was entitled to his deed. To uphold the conten-
tion of plaintiff and the judgment of the trial court would not
be equity if we apply the rule above referred to. The plaintiff'
is not entitled to relief, and the only question is, What relief is
the defendant entitled to under the pleadings and evidence?'
The evidence shows that the contract of purchase was a verbal
one between defendant and the agent of the townsite company,
and that while it was for the sale of real estate there was part
performance of the contract, and may be enforced by the defend-
ant. (See Idaho Rev. Stats., sec. 6008.) 3 Pomeroy's Equity
Jurisprudence, section 1409, says: "It would be a virtual fraud
for the defendants, after permitting the acts of part perform-
ance, to interpose the statute [meaning the statute of frauds]
as a bar to the plaintiff's remedial right. The acts of part
performance, therefore, in order to satisfy this principle, must
be done in pursuance of the contract, and must alter the rela-
tions of the parties. The most important acts which constitute
a sufficient part performance are actual possession, permanent
and valuable improvements and these two combined." In *Day
v. Cohn,* 65 Cal. 508, 4 Pac. 511, it is said: "A subsequent pur-
chaser from the vendor, with notice of the agreement on the part
of the grantor to convey the title, holds the same in trust for
the vendee, and is bound to convey it to him upon payment of'
the balance of the purchase money due by the agreement." The
same rule is enunciated in *Love v. Watkins,* 40 Cal. 548, 6 Am.
Rep. 624; *Murray v. Jayne,* 8 Barb. 613; *Bigelow v. Armes,* 108
U. S. 10, 1 Sup. Ct. Rep. 83, 27 L. ed. 631; *Calanchini v. Bran-
stetter,* 84 Cal. 249, 24 Pac. 149. Respondent in his brief says :
"The equitable relief of Schupfer's performance of contract is.
not a matter of right, strictly speaking, but rests in the sound
discretion of the court, upon an impartial view of all the circum-

stances surrounding the matters in controversy"—and cites *Vincent v. Larson,* 1 Idaho. 241, and a number of other authorities upholding this contention.  We have no fault to find with this position, or the authorities cited, and that is the rule we are attempting to apply to this case.  Every witness connected in any way with the Juliaetta Townsite Company who has testified in this case seems to have known of the defendant's possession and claim of right, as well as the improvements placed upon the lot in question, and the plaintiff was not an exception, as he testifies he knew defendant was in possession, had improvements upon the lot, and was informed, by Schupfer, at the time he delivered the deed, of defendant's claim.  The findings in this case should have been in favor of the defendant, and judgment and decree that defendant is the owner of and entitled to the possession of said lot and a deed from the respondent therefor.

The judgment is reversed, and cause remanded for further proceedings in accordance with this opinion, with costs to the appellant.

Quarles, C. J., and Sullivan, J., concur.