## LLOYD ET AL. *v.* LLOYD ET AL.

[No. 16,831.   Filed May 24, 1943.   Rehearing denied June 22, 1943.   Petition to transfer dismissed September 17, 1943.]

*Paul R. Schnaitter,* of Madison, *William L. Travis,* of Hammond, and *Julius C. Travis,* of Indianapolis, for appellants.

*Joseph M. Cooper, Eugene Cooper,* and *Arthur D. Cutler,* all of Madison, for appellees.

DRAPER, J.—Oliver Lloyd died intestate on December 23, 1922, the record owner of 310 acres of improved land in Jefferson County. He left as his sole heirs at law his widow, Mary Frances Lloyd, a son Aljah W., a daughter Louanna Rock, and a son Albert. Aljah W. Lloyd and Louanna Rock are the appellants here.

Albert died intestate on November 16, 1934, leaving as his sole heirs at law his widow, Myrtle Lloyd, and five children—Arthur, Charles, Ruth Sooy, Pearl Jackson and Nelda Mundt—all appellees here. Mary Frances, Oliver's widow, died intestate on December 14, 1936.

On November 30, 1937, the appellants filed suit to partition the land, each alleging ownership in themselves of a one-third interest and that Albert's widow and children were collectively entitled to a one-third interest. Answers were filed and Myrtle, and the chil-

dren of Albert and Myrtle collectively, each filed separate cross-complaints. In Myrtle's she alleges that Oliver in his lifetime, and on or about January 15, 1908, gave the land to Albert and her in consideration of love and affection and that Albert and she should look after and take care of and provide for Oliver and his wife Mary Frances as long as they or either of them lived, which she alleges they agreed to do and did do. She further alleges that pursuant to this agreement Albert and she took full possession and control of the lands and made valuable and lasting improvements thereon. That she and Albert cared for Oliver until his death in 1922, that they both cared for Mary Frances until Albert's death in 1934, and that she alone thereafter cared for Mary Frances until the latter's death in 1936. She alleges that at the time of Albert's death she and Albert were the equitable owners of the place by entireties so that she then became the sole owner thereof, and she prays that she be adjudged to be the owner of the land and that a commissioner be appointed to make conveyance thereof to her.

The cross-complaint of the children is substantially the same except that they allege that the gift was to Albert rather than to Albert and Myrtle and upon Albert's death they and their mother Myrtle became the owners of the land, and they seek to quiet the title in themselves and their mother Myrtle, and to have a commissioner appointed to convey the land to them and Myrtle as tenants in common.

The court found against the appellants on their complaint, against Myrtle on her cross-complaint and for the children on their cross-complaint that the children and Myrtle are the equitable owners of the land, one-third to Myrtle and two-fifteenths each to the children,

and the court appointed a commissioner to execute a deed to them accordingly.

The error assigned is the overruling of appellant's motion for new trial wherein it is alleged that the decision of the court is not sustained by sufficient evidence and that the decision of the court is contrary to law.

The evidence shows that Oliver was a man weighing 200 pounds or more and that several years before he died he broke his hip and thereafter lived mostly in a wheel chair until he became and remained bedfast for two or three years and he naturally required much care. His unusual size and helplessness made him a heavy burden and to attend to some of his requirements, such as his clothes and laundry, was disagreeable as well as difficult. Mary Frances too was a great care. During her later years her mind was sometimes not normal, she had frequent spells and would fall and must be carried to her room. She required constant attendance. She could not take care of herself and had to be taken care of "like a baby." It is not disputed that Albert and Myrtle during his lifetime, and thereafter Myrtle alone took the most excellent care of the old folks.

Although the word "gift" is used in the pleadings and appears frequently in the evidence, it is apparent that the case was tried, and it was argued here, not upon the theory that the land was "given" to either Albert or Myrtle, but upon the theory of an oral contract for the convyance of the real estate in consideration of love and affection and a promise to care for, look after and provide for Oliver and Mary Frances so long as either should live.

The court in finding for the children on their cross-complaint, necessarily found that such a contract had been entered into between Oliver and Albert and that the other material averments of their cross-complaint

were true, including the taking under the contract of full possession of the land by Albert and the full and complete performance of the contract on Albert's part.

In this case Albert had never resided elsewhere than on this farm, with the exception of several months in the early days when he attended school, but had always lived and reared his family there and continued to live there with them and his parents until Oliver's death in 1922 and then with his mother until his own death in 1934.

It has been held in Indiana that where a contract to convey real estate in consideration of support and maintenance is established by competent evidence, and has been withdrawn from the operation of the statute of frauds by possession taken thereunder, and by fair and complete performance on the one hand, a decree for specific performance may be had in favor of the party who has taken possession and fully performed his part in reliance on the contract. *Denlar, Administrator, et al.* v. *Hile* (1890), 123 Ind. 68, 24 N. E. 170.

It was said in the case of *Donnelly* v. *Fletemeyer* (1932), 94 Ind. App. 337, 176 N. E. 868, that an oral contract for the conveyance of real estate is within the inhibition of the statute of frauds and specific enforcement of it cannot be had even though there has been complete compliance with its terms, in the absence of possession taken under and pursuant to the contract, and the court quotes the case of *Riley* v. *Haworth* (1903), 30 Ind. App. 377, 64 N. E. 928, as follows: "It is said that the important acts which constitute part performance are actual, open possession of the land, or permanent and valuable improvements made on the land, or these two combined. Pomeroy, Eq. Jurisp. (2d ed.), § 1409, note. But in order that possession may remove the case from the effects of the statute

there must be an open and absolute possession taken under the contract, and with a view to its performance. The possession must be yielded by one party, and accepted by the other, as done in performance of the contract. If possession precedes the contract, or if the contract be with a tenant already in possession, and who continues in possession afterwards, the contract is within the statute as in neither case was there a change of possession in execution of the contract."

In the later case of *Brown* v. *Freudenberg* (1939), 106 Ind. App. 692, 700, 17 N. E. (2d) 865, 868, this court held that exclusive possession is not a prerequisite to a decree of specific performance and the court said that ". . . where the grantee takes such possession of the property as is consistent with the existing conditions and circumstances imposed by the contract, and where the contract has been fully performed, specific performance should not be denied for the sole reason that the possession taken was not exclusive in the ordinary meaning of the term." In that case the grantee moved into the grantor's home after the agreement had been made, and pursuant to its terms.

In the case of *Swales* v. *Jackson et al.* (1890), 126 Ind. 282, 285, 26 N. E. 62, it is said that "If they (the vendees) were already occupying the land, whether as tenants or as former owners, and simply continued in possession after the parol contract was made, there was no such taking of possession under the contract as will take the case without the statute of frauds.

"To bring a parol contract for the sale of real estate within the exception to the statute, which requires all such contracts to be in writing, there must be an open and visible change of possession under the contract."

The mere continuance of a possession previously taken is not, in and of itself, sufficient as an act of

part performance. *Waymire et al.* v. *Waymire* (1895), 141 Ind. 164, 40 N. E. 523. As said in *Johns et al.* v. *Johns et al.* (1879), 67 Ind. 440, 444, "The mere continuance of a former possession, referrible (sic) to some other origin or authority, is not sufficient." See also *Johnson* v. *Glancy and Others* (1835), 4 Blackf. 94, 28 Am. Dec. 45; *Swales* v. *Jackson et al., supra.* In the case of *Phillips* v. *Jones* (1906), 79 Ark. 100, 95 S. W. 164, it is said that: "Where the alleged purchaser is already in possession as tenant or otherwise, and merely continues in possession after making the contract, that alone is not sufficient to take the case out of the operation of the statute. Under those circumstances the possession is referable to the original holding as tenant or otherwise."

A possession taken prior to and held at the time of the making of such a contract does not of itself render the contract unenforceable, *Martin* v. *LaBoon* (1921), 116 S. Car. 97, 107 S. E. 320; *Phillips* v. *Jones* (1906), 79 Ark. 100, 95 S. W. 164, 9 Ann. Cas. 131, but where a possession continues there must be a radical change in the attitude of the parties toward each other, a notorious change which itself indicates that some contract has been made between the parties, for otherwise the continued holding is naturally and properly referable to the old tenancy and does not necessarily imply any new agreement between the parties. *Emmel* v. *Hayes* (1890), 102 Mo. 186, 14 S. W. 209, 11 L. R. A. 323. As said in the case of *Underwood* v. *Underwood* (1871), 48 Mo. 527, "The continued possession of one who had been in actual occupation before the alleged contract, or the taking actual possession by one who had been constructively in possession as tenant in common with the right of corporal entry, is not so easily shown to be an act of part performance as though

it were delivered to and taken by a stranger. In actions for specific performance it is held that the possession, or possession in connection with the payment, creates the equity, and in order to sustain a bill it should be referable exclusively to the agreement. . . . It is obviously more difficult to show such reference when the possession might be otherwise rightful than if the party would be a trespasser, but for the contract. It does not of itself indicate any contract whatever; does not, as would be the case with a stranger, point to one with which it might harmonize. In the case of a stranger the entry itself is evidence of some agreement, or he would be a trespasser. What that agreement is must be otherwise shown, for it my be a mere license; but it is otherwise with one in rightful occupancy without an agreement. Yet one in possession, whether actual or constructive, should not hence be deprived of the benefit of a parol agreement, if the continued possession can be shown to be held under it. But the agreement itself will not suffice to show the *quo animo*, if it is not continued, any more than the possession will show an agreement. In petitions of this kind there must be positive indications of a change of relations. Thus, in cases where a tenant continues in possession under an alleged agreement for a new tenancy, the purpose is answered by proof of any *act* on his own part, done with the privity of the owner of the fee, which is inconsistent with the previous holding, and is such as clearly indicates a change in the relation of the parties—as when he makes improvements upon the premises, this fact is of great weight to show a change in the holding."

We can find in this record no substantial evidence of any change in the attitude of the parties during their

life together which would indicate that a contract such as that alleged had ever been made.

The evidence indicates that Oliver and Albert were to a large extent the joint owners of the personal property on the farm at the time of Oliver's death. That they continued after 1908, the time when it is claimed that the property was transferred, to live together in the same manner as they had before. It does appear in the evidence that one witness testified that when he wanted some gravel he talked to Oliver about it and Oliver told him that he must see Albert, who was the one that was interested in it; that it made no difference to Oliver as it went to Albert anyway and that he had turned everything over to Albert and that Albert was taking care of it now. This bit of testimony falls far short of establishing part performance of such a contract and we find no other evidence which could be remotely considered as any evidence of it. On the other hand, although it is claimed that this property was transferred in 1908, no such claim was ever asserted until 1937 after the appellants had filed their complaint to partition the real estate. After Oliver's death in 1922 Albert was the administrator of his estate, and he in nowise asserted or indicated a belief that he was the owner of the farm or had any rights in it not shared by the appellants. In all of his verified reports to the court he indicated that he owned and claimed only that portion to which he would be entitled under the laws of descent. He paid his father's doctor bill and funeral expenses out of the funds of the estate. He paid the taxes against the farm out of the funds of the estate. Within a few days after the filing of his final report as administrator, he wrote a letter to his sister in which among other things he said: "If we could have staid out of court & got to gether we could

saved that inheritance Tax & nearly all the rest but as you know there was no other way out. I do not ask anything for Myrtle and I for services as we considered it our duty as you and Aljah was away and could not." Nor did Myrtle ever indicate in any way by words or actions, prior to the filing of her cross-complaint, that she claimed any such contract to have been made, or had any knowledge of such a contract. On the contrary the evidence makes a strong case against any such claim on her part. Without reviewing the evidence exhaustively, it is sufficient to say that it goes no further than to show the mere continuance of a former possession, and it is therefore not sufficient to support the finding of the court.

It is alleged in the children's cross-complaint that Albert had at his own expense made valuable and lasting improvements on the farm and the buildings thereon and this fact, if proven, has been held sufficient to refer the continued possession to the contract rather than to the previously existing tenancy. *Hogan* v. *Thrasher* (1925), 72 Mont. 318, 233 P. 607; *Pugh* v. *Spicknall* (1903), 43 Ore. 489, 73 P. 1020, 74 P. 485.

There is however no evidence that such was done in this case. It does appear that Albert, apparently with Oliver's help, cleared eight or ten acres of land and built eighty rods of fence and that Albert brought the wire home but it does not appear who paid for the wire, unless it was the wire paid for from Oliver's estate, and the posts seem to have come from the land. This increased the value of the land cleared about ten dollars per acre. Albert repaired the fence around the barn and employed and paid a man to saw some lumber to be used for a small building on the farm but as has been mentioned, in his final report as administrator of Oliver's estate filed April 3, 1924, he not only charged

against the estate the labor in erecting the barn but also charged other items such as grass seed, coal tar, labor for painting roof and other labor, the cost of wall-paper and labor of papering and plastering the tenant house, barbed wire, red top seed, doctor bills, taxes on the farm and insurance premiums.

It will be remembered that Albert's mother survived him by about two years and it is claimed that by reason of that fact there was such a failure of performance on his part as would abrogate the contract. In view of the conclusions reached, however, it will not be necessary to decide that question.

Judgment reversed with instructions to sustain appellants' motion for new trial.

NOTE.—Reported in 48 N. E. (2d) 837.