849 P.2d 954

Elwood (Woody) D. WING,
Plaintiff–Appellant,

v.

Lysle MUNNS, Defendant–Respondent.

No. 18732.

Court of Appeals of Idaho.

March 3, 1992.

Daniel L. Hawkley, Boise, for plaintiff-appellant.

Hall & Friedly, Mountain Home, for defendant-respondent. Perce E. Hall argued.

SWANSTROM, Judge.

Elwood Wing filed an action against Lysle Munns to have Munns remove his mobile home from Wing's farm and vacate the premises. Munns counterclaimed, alleging that he was lawfully on Wing's property under an oral lease, and that Wing was responsible for damages because he interfered with the system upon which Munns depended for his domestic water supply. The district court issued a preliminary injunction and ordered Wing to restore Munns's water system pending the outcome of the litigation.

The case was tried before a jury, and the jury concluded that Wing was not entitled to rental payments from Munns. Munns also prevailed on his counterclaim and was awarded $4,000 in compensatory damages and $2,000 in punitive damages. Both Wing and Munns filed motions for judgment notwithstanding the verdict. Wing contended that the award of damages to Munns was unwarranted and unsubstantiated. His motion, as well as Munns's motion, was denied. Wing has appealed.

## ISSUES

Wing contends that the district court erred in concluding that Munns had an enforceable oral lease giving him the right to reside on Wing's farm for a two-year period. Wing asserts there was no meeting of the minds for a lease, and, even if there were, the lease was in violation of the statute of frauds, I.C. §§ 9–503, 9–505.

Wing also contends the court erred in issuing a preliminary injunction because: (1) it effectively gave Munns all of the relief he was seeking without a trial; (2) it was based on the assumption that an enforceable oral lease existed between the parties; and (3) the court improperly placed the burden on Wing to show cause why the preliminary injunction should not be issued.

Third, Wing contends that his right to a fair trial was prejudiced because the court erroneously allowed the jury to hear evidence regarding the preliminary injunction and evidence of collateral hardships suffered by Munns, which Wing did not cause and which Wing could not have avoided.

Finally, Wing contends that these errors were compounded when the court failed to grant his motions for a directed verdict and for judgment n.o.v. We hold this issue has merit and is dispositive of the case because it encompasses other critical issues raised by Wing. For reasons herein stated, we conclude that the district court erred in denying Wing's motions, and we remand for entry of judgment in favor of Wing on Munns' counterclaim.

## FACTS

The relationship between Wing and Munns developed as follows. Lysle and Norma Munns, in 1979, contracted to buy 320 acres of farmland in Elmore County,

Idaho. They installed a mobile home on a concrete foundation, dug a well for domestic water, and made other improvements while they occupied and farmed the property.

Eventually, their farming enterprise failed. After they filed a bankruptcy proceeding, their seller was successful in regaining the property and quieting his title in 1985. He resold it to Elwood Wing in February, 1988. At the time of this sale, the Munns still had their mobile home on the property, and they were living in it with the acquiescence of the owner of the property.

In February, 1988, Munns contacted Wing, the new owner, and asked first if he could buy fifteen acres of the farm. Wing made it clear that he could not. Munns then asked if he and his wife could continue to live in their mobile home on the property until his retirement in two years. Wing said it would probably be all right, but he wanted to confirm this with his son, Sid, who was going to be involved in farming the property.

The parties agree only to the above facts about the first meeting. Altogether, four or five meetings took place between Munns and one or both of the Wings where they discussed terms and conditions of an oral "agreement" which would enable Munns to keep his mobile home on the property for two years, until he could retire. The parties' trial testimony disputed, or left unclear, what was said and what was agreed to at each of these meetings. Because Wing contends that the evidence was not sufficient to show there was ever a meeting of the minds concerning the essential terms of an oral lease, we will summarize the evidence.

Munns testified that, at the first meeting, he offered to trade some sprinkler irrigation pipe to Wing in exchange for a two-year lease of the mobile home site. Wing testified that, at the first meeting, there was no mention of any irrigation pipe or rental payment from Munns for allowing him to remain on the property. He testified that he and Munns had been "neighbors" while Munns was attempting to purchase and farm the place. Wing said he had also talked to the previous owner who had suggested that Wing "be gentle so we wouldn't have any problems."

Munns testified that several days later he saw Wing at church, and "[h]e told me he had talked it over with his boy and they decided it was agreeable." Wing made no mention of this contact, and he was not asked if he disputed it. In any event, Munns does not contend that anything further was said about the "agreement" at this time. Munns also testified that within a day, as he was driving down the road, Wing stopped him and told him that Wing did not want Munns to leave any of his equipment on the farm. As we mention later, scattered around the farm were various pieces of old farm machinery which had been left over after a creditor's sale of Munns's equipment, in addition to other items that Wing described as debris or junk. Munns testified that Wing first told him the equipment should be moved off the farm to a certain location then Wing changed his mind. Munns continued:

> And about that time I was entirely confused, and so I let him talk on for a minute. And I don't remember what he said, what he previously said, and so I just left and I went home.

The parties agree that a few days after the first meeting an event occurred which precipitated a second significant meeting. Farm workers employed by Wing were loading irrigation pipe which had been piled on the Wing farm about 600 feet behind Munns's mobile home. Munns went out to the workers and, according to his testimony, he pointed to some of the pipe and said, "Now, this pipe here I don't want you to move until you tell your boss to come and see me one more time." That evening Wing and his son Sid drove to Munns's mobile home and met with Munns. According to Munns, the following conversation occurred:

> Sid Wing said, "What's the matter? You stopped my men from moving the pipe." I said, "that's true." And I said, "I wanted to make sure that we definitely understood each other. That we definite-

ly had an agreement and we definitely understand each other."

And he [Sid] said, "Well, our word is as good as yours. We do have an agreement."

And I said, "Okay. Then it's definitely sure I get to stay here for two years for the, for my pipe?"

And he said, "That's true," and they left.

.    .    .    .    .

The next day the [farm workers] hauled the pipe away.

Munns later testified that he and Wing had also discussed other aspects of their "agreement" at this meeting, or at an earlier one. He admitted that he had agreed to clean up the scattered junk and debris which was discarded during his farm operation and the items which were left over from the creditors' sale of his equipment. He agreed that Wing wanted him to consolidate or remove any machinery which he owned and wanted to retain. He acknowledged that the Wings had told him they wanted the property cleaned up so that it could be farmed. He admitted discussing with Wing—at some point—the placement of this equipment on a piece of ground about a half-mile from Munns's mobile home. He also recalled that Sid Wing wanted the agreement to be in writing.[1]

Wing testified that it was during this meeting when Munns first brought up his claimed ownership of some of the irrigation pipe. When they purchased the property, the Wings believed that the purchase included all of the irrigation pipe on the premises. From their own inspection, the Wings had counted all of the pieces of pipe, amounting to approximately three-fourths of a mile of "portable main line" pipe, which is the amount of pipe they were to receive in addition to a half-mile of buried main line. Munns said, however, that he told Wing in the very first meeting that he had a half-mile of irrigation pipe which he valued at $4,000 and that he would be willing to exchange the pipe for a two-year lease. In any event, at some point the Wings decided that if Munns was willing to give up his claim to the pipe and the parties could otherwise agree to certain conditions, they would permit him to remain on the property for two more years. The Wings' desire to have a written agreement led to the next, and final, meeting with Munns.

Wing's attorney prepared a document entitled a "settlement agreement." It was not complete. The district judge described it as an intended draft "for the parties to work from to tie up loose ends of their oral agreement." No signature lines were on this draft and there was a blank space for insertion of a property description. It contained some things agreed to by the parties and some which had not been discussed but which the Wings wanted included for their protection. Wing and his son took the document to Munns.

The Wings testified that Munns hardly looked at the document and did not want to discuss it. They said Munns told them that he had applied for a job in Utah and he was going to move in about two weeks; that he was going to "gather up half a mile of pipe and sell it" so that he could pay for the move; that Wing insisted he did not own any of the pipe; and that Munns insisted he did. Munns did not deny that this conversation occurred. However, Munns did testify that he glanced at the "Settlement Agreement" and noted that it included terms which the parties had not discussed and that he told Wing he wanted time to look it over. He said Wing was angered and left abruptly. A few days later, on March 12, 1988, Wing had Munns served with a thirty-day "Notice of Termination of Tenancy at Will and Notice to Vacate." On

---

**1.** Later, during cross examination, Munns was asked about his understanding about the number of acres he was leasing. He stated that it was between three and four, and that the lease would include the area where Munns had constructed a shallow well, cistern and pumps for his domestic water supply. He stated that he had determined where the boundaries should be, but he admitted that he had not discussed the boundaries with Wing. He conceded that he had one idea of the boundaries. "Woody [Wing] maybe had his opinion of another." He conceded there was no agreement between them as to the boundaries of the lease. He also said there would be another area of about an acre where he could keep his equipment, but he produced no evidence that Wing had agreed to lease a site for such a purpose.

April 22, Wing filed a summary action to remove Munns from the property. A month later Wing filed an amended complaint, seeking more complete relief.

In the meantime, about April 15, 1988, Wing moved a trailer home onto his property about one-eighth of a mile from Munns's mobile home. The trailer, intended for the use of Wing's irrigators, was parked near the pump and cistern at the source of Munns's domestic water supply. Connections were made between the trailer and Munns's water line. The trailer's electrical system was also connected to the electrical panel for Munns's water pump. Within a few days the power to the pump failed, cutting off Munns's water supply. Munns discovered that the fuse holder had burned out. After Munns tried to restore the power to the pump, the pump motor also burned out. Munns notified Wing that he had no power to maintain his water supply, but nothing was done to remedy the situation. Munns adapted an alternative system with some equipment he purchased, but he had to resort to hauling water when the equipment was disassembled and taken away by Wing's son, Sid.

Faced with this predicament, Munns applied for an injunction to enjoin Wing from further interfering with the system which pumped water to his home. Wing objected, and a combined hearing on Munns's motion for order to show cause and Wing's motion to quash the order to show cause was held on July 21 and 22, 1988. The district court issued a preliminary injunction, ordering Wing to restore Munns's water supply and to cease any attempt to deprive Munns of water but it was months later before the system was made operational.

Sometime before the trial in January, 1990, Munns had moved his mobile home from Wing's property. The trial dealt with Wing's remaining claims for rent against Munns and Munns's claim for damages caused by Wing's interference with the water supply to his home. The jury decided in Munns's favor, awarding him damages. When Wing's motion for judgment n.o.v. was denied, this appeal followed. Because we believe that the critical issues are raised in connection with the motions for a directed verdict and for judgment n.o.v., we will discuss these issues first.

## MOTIONS FOR DIRECTED VERDICT AND JUDGMENT N.O.V.

As noted earlier, Wing contends that for two reasons the district court should have granted the motions for a directed verdict and for judgment n.o.v.: (1) there was insufficient evidence to support a finding that the parties had a meeting of the minds on the essential terms of a lease, and (2) even if there was an oral lease, it was unenforceable because it violated the Idaho statute of frauds.

> A motion for a judgment notwithstanding the verdict admits the truth of the adverse evidence and every inference that may be legitimately drawn therefrom. *Mann v. Safeway Stores, Inc.*, 95 Idaho 732, 518 P.2d 1194 (1974).

*Sherwood v. Carter*, 119 Idaho 246, 261, 805 P.2d 452, 467 (1991).

> [B]ecause the moving party admits the truth of the adverse evidence, in determining its sufficiency we will not examine any conflicting evidence that was presented by the appellants.

*Brand S Corporation v. King*, 102 Idaho 731, 733, 639 P.2d 429, 431 (1981).

> In ruling on a motion for judgment n.o.v., the trial court must view the facts as if the moving party has admitted the truth of all the non-moving party's evidence. If, after reviewing the evidence in this manner, the court finds that the evidence is of sufficient quantity and probative value that reasonable minds could have reached the same conclusion as did the jury, then the jury's verdict will be upheld. Furthermore, the determination of whether the evidence before the Court considering the judgment n.o.v. is sufficient to create an issue of fact is purely a question of law. And, in determining whether a judgment n.o.v. should have been granted, the appellate court applies the same standard as does the trial court which originally ruled on the motion.

. . . .

A motion for judgment n.o.v. has been described as a delayed motion for directed verdict and it can be used by the district court to correct its error in denying a directed verdict.

*Hudson v. Cobbs*, 118 Idaho 474, 478–79, 797 P.2d 1322, 1326–27 (1990) (citations omitted).

In orally ruling on the motion for a directed verdict, the district court stated that from the evidence presented and the reasonable inferences the jury could find there was a two-year oral lease. In the court's view, "the inference that could legitimately be drawn was that the agreement to use the property included the use of the water system as well as the other portion of the property that had been used by [Munns] at the time the agreement was entered into." The court also held that the consideration for the lease was "the relinquishment of the pipe by [Munns]" and "that there was at least partial performance of that sufficient to take it out of the statute of frauds."

If the district judge was incorrect in either of his legal conclusions, the verdict cannot stand. Our standard for reviewing the sufficiency of the evidence to establish whether there was a meeting of the minds about the essential terms of a lease have already been stated. It remains for us to state what minimum terms must be agreed upon before there can be a lease.

## SUFFICIENCY OF THE EVIDENCE OF A LEASE

■ We start with the basic principle that Munns had the burden of proving the alleged agreement to lease and its enforce-ability. *Johnson v. Albert*, 67 Idaho 44, 170 P.2d 403 (1946). Specifically, Munns had the burden of going forward with the evidence necessary to prove the essentials of a lease and he had the ultimate burden of persuasion.[2]

■ In *Bennett v. Richards*, 80 Idaho 140, 144, 326 P.2d 986, 988 (1958), our Supreme Court discussed the "essentials required to make a valid contract and to take it out from under the application of the Statute of Frauds."

" 'Under the authorities, to create a valid contract of lease, but few points of mutual agreement are necessary: First, there must be a definite agreement as to the extent and bounds of the property leased; second, a definite and agreed term; and, third, a definite and agreed price of rental, and time and manner of payment. These appear to be the only essentials.' Jones on Landlord and Tenant, p. 170, § 137a."

*Id.* at 144, 326 P.2d at 988, *quoting Gaskill v. Jacobs*, 38 Idaho 795, 225 P. 499 (1924). Because Munns claims only that he had an *oral* lease, and the defense of the statute of frauds was timely raised by Wing, Munns must also contend with statutes which have been in effect in Idaho for over 100 years. The first is now codified as I.C. § 9–503:

No estate or interest in real property, other than for leases for a term not exceeding one (1) year ... can be created, granted, assigned, surrendered, or declared, otherwise than by operation of law, or a conveyance or other instrument in writing, subscribed by the party creating, granting, assigning, surrendering or

**2.** Where, as here, the plaintiff is seeking specific performance of an oral contract to convey an interest in real property, the plaintiff must prove both the existence of the agreement and its terms by clear and convincing evidence. *McMahon v. Auger*, 83 Idaho 27, 357 P.2d 374 (1960); *Johnson v. Albert*, 67 Idaho 44, 170 P.2d 403 (1946). Specifically, this rule applies to proof of the terms of an oral lease. *Deeds v. Stephens*, 10 Idaho 332, 79 P. 77 (1904). Of course, "the clearness and convincing force of the evidence is a question primarily for the trial court, and if the trial court finds on substantial evidence, or on conflicting evidence, that the contract was made and is definite and certain, such finding of fact will not be disturbed on appeal." *McMahon*, 83 Idaho at 35, 357 P.2d at 378.

A similar rule would apply in a case where a jury is the fact finder. In the present case the jury was instructed only that a party having the burden of proof on any proposition must establish, from all of the evidence in the case, "that the proposition on which he has the burden of proof is more probably true than not true." We wish to make it clear, however, that no issue is raised in this appeal about the correctness of the jury instructions.

declaring the same, or by his lawful agent thereunto authorized by writing. The second is I.C. § 9–504:

> The preceding section must not be construed to affect the power of a testator in the disposition of his real property by a last will and testament, nor to prevent any trust from arising or being extinguished by implication or operation of law, *nor to abridge the power of any court to compel the specific performance of an agreement, in case of part performance thereof.* [Emphasis added.]

Failure to comply with the statute of frauds renders an oral agreement unenforceable both in an action at law for damages and in a suit in equity for specific performance. *Hoffman v. S V Company, Inc.,* 102 Idaho 187, 190, 628 P.2d 218, 221 (1981) (citations omitted). Even if the doctrine of part performance embodied in I.C. § 9–504 applies, it is important to keep in mind that "[a] court will not order specific performance unless the contract is complete, definite and certain in all of its material terms, or contains provisions which are capable in themselves of being reduced to certainty." *Wolske Brothers, Inc. v. Hudspeth Sawmill Company,* 116 Idaho 714, 716, 779 P.2d 28, 30 (1989) *citing Locklear v. Tucker,* 69 Idaho 84, 90, 203 P.2d 380, 384 (1949). We apply these rules to the evidence of a lease in the present case.

■ The first essential point of agreement must be as to the "extent and bounds of the property leased." *Bennett v. Richards, supra.* While the nature of the lease here certainly requires less definition of the boundaries than would be required if we were dealing with a sale of real estate, nevertheless, the evidence must show that the parties expressly or impliedly agreed to the general boundaries.

Munns's own testimony does not establish that any such agreement was reached. He expressed a belief that he had a lease of three or four acres, which would include his mobile home and the well supplying his domestic water. He admitted that while he had his own idea of where the boundaries should be, he had not discussed this with Wing. In addition, he mentioned having a separate area of about an acre for keeping some machinery. Munns offered no proof to show where on the 320 acre farm this storage area would be, except to say that it was about a half a mile from his house. He did not establish that Wing had agreed to a certain location or even that Wing had agreed to lease this additional ground. In fact, Munns himself offered into evidence the "Settlement Agreement" which Wing had futilely proposed at the parties' last meeting. The proposed agreement showed Wing intended that his permission for Munns to use the property did not "extend to the use of any property ... beyond the [mobile home] and the existing curtilage."

The second essential lease component was not disputed. The parties understood and agreed that the length of the "lease" would be two years.

The major dispute at trial was over the third essential component of the lease: "a definite and agreed price of rental, and the time and manner of payment."

As noted earlier, Munns testified that, at his first meeting with Wing, he offered to give Wing his irrigation pipe, which he valued at $4,000, as rental for a two-year lease, and that Wing later accepted the offer after talking it over with his son. Munns's evidence showed that he had purchased about one-half mile of used pipe in 1980 or 1981 which was still on the farm when Wing purchased the farm in 1988. We must accept Munns's version of these events.

This does not mean, however, that we must agree with Munns's claim that he was the owner of the pipe. As we discuss later, Munns's evidence at trial—even when construed most favorably toward Munns—established only that he owned the pipe prior to the bankruptcy proceedings. However, Wing's evidence clearly showed that, in a quiet title action brought by the former owner of the farm, the farm and the pipe were decreed to belong to the former owner, who subsequently sold them to Wing. Accordingly, when Munns relinquished his claim to the pipe in exchange for a two-year lease, the pipe, in fact, had already

been purchased by Wing when he bought the farm. Wing's evidence of ownership can hardly be ignored. First, it was largely documentary evidence from independent sources which predated Wing's dispute with Munns. Second, the evidence was not rebutted by Munns. Thus, it is clear that what Munns gave as rental or consideration for a two-year lease was not $4,000 worth of pipe but only the relinquishment by Munns of a claim to pipe he did not own.[3]

The dispute or misunderstanding over the nature of the consideration is important. Wing thought that he, not Munns, owned all of the pipe on his property but, in return for Munns's agreement to clean up the area and to relinquish *all* claim to the pipe, Wing was willing to allow Munns to remain on the property for two more years. Clearly, Wing intended that if Munns later decided volitionally to move before the two-year term was up, Munns could not reassert any claim to the pipe. Just as clearly, Munns had a different idea of the agreement. Asserting that he owned $4,000 worth of pipe, Munns believed that even if he chose to leave prematurely he should have the right to a pro-rata return of the "unearned" rent.

In summary, we cannot say that Munns's proof established that the parties had reached an agreement "complete, definite and certain in all of its material terms," so that the district court could order specific performance notwithstanding the statute of frauds. *Wolske Brothers, Inc.*, 116 Idaho at 716, 779 P.2d at 30. Nevertheless, we will also address the question whether Munns's performance of the "agreement" was sufficient to establish "an equitable ground to avoid the strictures of the statute of frauds." *Frantz v. Parke*, 111 Idaho 1005, 1009, 729 P.2d 1068, 1072 (Ct.App. 1986).

## PART PERFORMANCE AND THE STATUTE OF FRAUDS

■ As noted earlier, the district court held that relinquishment of the pipe by Munns was sufficient part performance to avoid the strictures of the statute of frauds. It has been said that the language of I.C. § 9–504, *supra*, clothes the trial judge with "wide discretion in according or withholding specific performance." *Roundy v. Waner*, 98 Idaho 625, 628, 570 P.2d 862, 865 (1977). Nevertheless, if this discretion were without bounds the statute of frauds would be a nullity.

In *Frantz v. Parke*, 111 Idaho at 1009, 729 P.2d at 1072, this Court said that "[t]he doctrine of part performance is best understood as a specific form of the more general principle of equitable estoppel." The doctrine of part performance does not literally take a contract out of the statute of frauds. "Rather, it is more accurate to say that in some circumstances, part performance may establish an equitable ground to avoid the strictures of the statute of frauds." *Id.* Our Supreme Court had taken this same approach much earlier. In *Anderson v. Whipple*, 71 Idaho 112, 227 P.2d 351 (1951), the Court said:

> Another underlying principle, applicable where the contract does not comply with the statute of frauds, is that equity will not enforce it except in cases where a refusal to do so would be inequitable. Conversely, where a party has so performed, or changed his position in reliance on the contract, that to allow the other party to interpose the statute of frauds as a defense, would perpetrate a fraud on the performing party, and the legal remedy is inadequate, equity will decree specific performance.

71 Idaho at 127, 227 P.2d at 360 (citations omitted).

---

**3.** This was not the only consideration which Munns was to provide in exchange for the right to remain on the property for two more years. Both parties testified that Munns agreed to clean up the personal property and debris which was scattered about so that it would not interfere with Wing's farming operations. The evidence at trial showed—in fact, Munns admitted—that the cleanup work was not performed. The non-performance, whether excused or not, is of no importance to our decision. We mention it merely to show that both parties recognized this work was part of the agreed consideration for the lease. The Wings testified that, to them, it was an important benefit which they expected to gain from Munns' occupancy.

Further guidance in weighing the factors which constitute part performance, and which therefore might raise an equitable estoppel against a party who attempts to raise the statute of frauds as a defense, was provided in *Roundy v. Waner, supra,* where the Court said:

> "The most important acts which constitute a sufficient part performance are actual possession, permanent and valuable improvements and these two combined." *Barton v. Dunlap,* 8 Idaho 82, 92, 66 P. 832, 836 (1901), quoting from 3 Pomeroy's Equity Jurisprudence, section 1409.

98 Idaho at 629, 570 P.2d at 866. *See also Hoffman v. SV Company, Inc.* 102 Idaho at 191, 628 P.2d at 222 ("improvements made by a party and upon which they rely for part performance must be substantial in relation to the value of the property"). With these principles in mind, we now turn to the facts of the present case.

The taking of possession of realty by a party under an oral agreement is generally considered to be one factor of part performance. Here, however, Munns was already in possession of his mobile home when the lease "agreement" was made. In this regard, he did not show that any change in his position occurred as a result of the lease. Munns was at the time a tenant at will who could be dispossessed by the owner if given thirty-days notice. The continued possession of a tenant who was in possession at the date of the alleged oral agreement is not "part performance" which will avoid the strictures of the statute of frauds. *Boesiger v. Freer,* 85 Idaho 551, 381 P.2d 802 (1963) (oral contract for sale of real estate); *Dabanian v. Rothman,* 291 Mich. 31, 288 N.W. 324, 325 (1939) (oral lease); *Lloyd v. Lloyd,* 113 Ind.App. 623, 48 N.E.2d 837, 839 (1943) (oral lease).

In the brief time that Munns believed he had a lease he made no improvements, valuable or otherwise, to the property. Therefore, neither of the "most important" factors constituting "part performance" is present here. *Hoffman v. SV Company, Inc., supra; Roundy v. Waner, supra.*

The evidence produced by Munns to show his part performance of the lease agreement was his relinquishment of a claim to irrigation pipe located on Wing's property. The detriment to Munns was not significant or irreversible. After he relinquished his claim, the evidence shows the pipe was moved by Wing, repaired, and later used in irrigation of the farm. According to Munns, the pipe was valuable, worth about $4,000. Even if Munns owned this pipe at the time he relinquished his claim, a highly questionable proposition, he could have readily brought an action at law for return of the pipe or for its value.[4] The value of the pipe would be easily ascertainable.

The evidence does not suggest that failure to grant specific performance of the oral lease would work a fraud on Munns. Munns did not show that his legal remedy for return of the pipe, or its value, and damages would not be adequate remedies. Accordingly, under the principles stated in *Anderson v. Whipple, supra,* specific performance of the lease should not have been granted.

---

**4.** When Munns contracted to buy the farm in 1979, it came with three-fourths of a mile of above-ground mainline irrigation pipe. A year or two later, Munns purchased a half-mile of used pipe in order to increase his irrigable acres. In 1982, he contracted to replace part of the existing mainline with new underground mainline. In connection with this project, he traded in a half mile of pipe, ending up with the same amount of above-ground pipe as shown on his original contract of purchase, where the pipe was designated as part of the realty.

When Munns filed for bankruptcy, his schedules of personal property did not include any pipe because it was considered part of the realty, pledged as security. The pipe was also subject to a secondary lien of the FmHA. Munns's predecessor, who held the primary lien, regained the property and filed an action which resulted in a decree quieting title to the farm, including three-fourths of a mile of above-ground mainline. Both Munns and FmHA were named as parties defendant in the quiet title action. When Munns's predecessor resold the farm in 1988 to Wing, Wing purchased the three-fourths of a mile of mainline pipe comprising the pipe claimed by Munns. As mentioned earlier, these facts were established by documentary evidence, basically undisputed.

## PRELIMINARY INJUNCTION ISSUES

Wing contends that the district court erred in issuing a preliminary injunction which was predicated on the judge's belief that Munns had an enforceable oral lease. Wing also contends that the judge erroneously placed the burden on Wing to show cause why a preliminary injunction should not be issued. We have not been furnished with a transcript or recording of the evidence produced at the two-day "order to show cause" hearing. As a result, these issues are unreviewable. Moreover, it is unnecessary to review any of the issues Wing has raised regarding the preliminary injunction, given our rulings on the statute of frauds issues. Likewise, it is not necessary for us to address the evidentiary issues raised by Wing.

In summary, we hold that the district court should have granted Wing's motion for a directed verdict or, failing that, should have granted Wing's motion for judgment n.o.v. The evidence produced by Munns did not establish the essential terms of an oral lease with sufficient definiteness and certainty so as to avoid the strictures of the statute of frauds. Moreover, the part performance of the agreement was not sufficient, as a matter of law, to justify the equitable remedy of specific enforcement. Accordingly, we reverse the judgment entered upon the jury's verdict and we remand the case for entry of a judgment in favor of Wing on Munns' counterclaim.

Costs to appellant Wing. No attorney fees awarded on appeal.

WALTERS, C.J., and SILAK, J., concur.